**ALCMAN SERVICES CORPORATION,**
Plaintiff,

v.

**Samuel H. BULLOCK, P.C.,**
**et al., Defendants.**

**Civil No. 95–02292.**

United States District Court,
D. New Jersey.

March 26, 1996.

254

Stephen P. Yuhas, Crawshaw, Mayfield, Riordan, Turner, O'Mara, Donnelly, Thomas & McBride, Cherry Hill, NJ, for defendants.

Barry F. Penn, Cherry Hill, NJ, for plaintiff.

## OPINION

IRENAS, District Judge.

Centuries ago alchemists endeavored to transmute lead into gold. The plaintiff before us today, equally inspired and perhaps more creative, has attempted to transform its leaden judgment against an impecunious adversary into claims of gold against the adversary's well insured lawyer. Plaintiff's black magic consisted of entering into a settlement with its adversary in which plaintiff agreed to stay execution of its judgment against the adversary in exchange for the adversary assigning to plaintiff the adversary's legal malpractice claim against its lawyer. Alas, such a transmutation is as impossible in law as it is in chemistry.

## I. BACKGROUND

On June 24, 1988, plaintiff Alcman Services Corporation ("Alcman") purchased a four-story apartment building located at 1305 Locust Street ("Building") in Philadelphia. Alcman is a Pennsylvania corporation formed by Rudolph Di Massa (father) and Anthony Di Massa (son), who are Pennsylvania attorneys as well as landlords.

On June 9, 1989, Alcman entered into a construction agreement with a general contractor, Joseph A. Cairone, Inc. ("Cairone"), for the renovation of the Building. Alcman also contracted independently with Majek Fire Prevention, Inc., ("Majek") a New Jersey corporation, to install and obtain a permit for a fire protection system.

In June 1990, Alcman filed a complaint in the Philadelphia Court of Common Pleas (Docket No. 3653; Def.Ex. B) alleging that Cairone, its subcontractors, and Majek had not adequately performed their contractual obligations. Alcman, which was represented

by Rudolph Di Massa, served the complaint on Majek.

■ Majek retained the law firm of Samuel H. Bullock, P.C., ("Bullock") to represent it in the Philadelphia action.[1] Bullock is located in Pitman, New Jersey. Although one of the defendants, Thomas Holloway, is licensed to practice law in Pennsylvania, Bullock does not have an office in Pennsylvania. A default judgment for $7 million was entered against Majek on August 17, 1990, for failure to answer the Complaint. In oral argument, Alcman's lawyer stated that the $7 million default judgment was entered based on an affidavit that Alcman filed with the court representing that such amount was lawfully due and owing to Alcman. This judgment appears never to have been vacated. The plaintiff subsequently domesticated the judgment in New Jersey Superior Court. Alcman was able to collect $4,000 by garnishing payments made by a third party to Majek. Majek is a small company with few assets.

Four-and-a-half years after the entry of default judgment, on December 13, 1994, Alcman entered into an agreement ("Agreement") (Def.Ex. D) with Majek pursuant to which Majek assigned to Alcman its cause of action for attorney malpractice against Bullock.[2] Alcman in turn promised to stay execution of the Philadelphia judgment. The Agreement has a choice of law provision which states that "[t]he Assignment of the subject legal malpractice cause of action including all agreements contained therein, is entered into in the State of New Jersey and shall be construed and interpreted in accordance with the Laws of the State of New Jersey." Def.Ex. D, ¶ 8.

Alcman filed a Complaint against defendants in this Court on May 19, 1995, six months after the Agreement, alleging that Bullock's malpractice was the proximate cause of the $7 million default judgment. The Complaint contains two counts. The

---

1. We recognize that this point is contested. However, in a summary judgment motion we must accept the non-movant's version of the facts.

2. Perhaps coincidentally, the parties entered into the Agreement at the same time that *Ammon v.*

*McCloskey*, 440 Pa.Super. 251, 655 A.2d 549 (1995) was being decided. That case was argued on September 29, 1994, and a decision was filed on January 10, 1995, which upheld an assignment very much like the one in the Agreement.

first count charges Bullock with negligence. The second count asserts that Bullock lied to Majek about its actions on Majek's behalf and seeks punitive damages. The Complaint does not assert breach of contract.

Defendant Bullock moves for summary judgment on the grounds that New Jersey law prohibits the assignment of a cause of action for attorney malpractice. Plaintiff, in its opposition briefs, counters that such an assignment is permitted in New Jersey and that, if not, the contract should be construed under Pennsylvania law despite the choice of law provision to which plaintiff itself agreed.

## II. STANDARD OF REVIEW

■ Under Fed.R.Civ.P. 56(c), "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A non-moving party may not rest upon mere allegations, general denials, or vague statements in opposition to a summary judgment motion. If the non-moving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Bixler v. Central Penna. Teamsters Health & Welfare Fund*, 12 F.3d 1292 (3d Cir.1993); *Trap Rock Indus. Inc. v. Local 825, Int'l Union of Operating Engineers*, 982 F.2d 884, 890–91 (3d Cir.1992).

■ It is not the role of the judge at the summary judgment stage to weigh the evidence or to evaluate its credibility, but to determine "whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court must draw all inferences in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, the Court must accept the non-movant's version as true. *Pastore v. Bell Tel. Co. of Penna.*, 24 F.3d 508, 512 (3d Cir.1994).

■ The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. A genuine issue of material fact for trial does not exist "unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir. 1987) (Becker, J., concurring).

## III. DISCUSSION

### A. Judicial Estoppel and Legal Malpractice

In obtaining its $7 million default judgment in the Philadelphia Court of Common Pleas, Alcman filed an affidavit swearing that Majek rightfully owed Alcman the full $7 million.[3] Alcman now seeks to come before this Court and argue, in essence, that Majek did not actually owe the full $7 million, but, rather, that some portion of that $7 million was a result of Bullock's malpractice. We hold that the doctrine of judicial estoppel bars Alcman from arguing such fundamentally contradictory positions.

■ Under the doctrine of judicial estoppel, a party is bound by his representations to a court and may not contradict them in a subsequent proceeding involving the same issues or representations. *Vogel v. Red Star Express Lines*, 73 N.J.Super. 534, 180 A.2d 351 (1962), *aff'd* 40 N.J. 44, 190 A.2d 666 (1963). New Jersey courts have thus held that, "a party will not be permitted to play fast and loose with the courts, nor to assume a position in one court entirely different or inconsistent with that taken by him in another court or proceeding with reference to the same subject matter or thing." *Koppel v. Olaf Realty Corp.*, 56 N.J.Super. 109, 151 A.2d 577, 583 (1959), *aff'd* 62 N.J.Super. 103, 162 A.2d 306 (1960) (holding that "the doctrine of equitable estoppel applies here be-

---

**3.** Although we have not been furnished with the actual affidavit, we rely on the representations of Alcman's lawyers that were made in oral argument.

cause the defendant has heretofore performed acts and admissions inconsistent with its present claim." *Id.*, 151 A.2d at 583).

■ In order to establish a claim for legal damages as Majek's assignee, Alcman would be compelled to argue that the $7 million judgment against Majek was obtained, not because Majek owed Alcman the money, but at least in part because of Bullock's negligence. This is so because, under the law of legal malpractice, both in New Jersey and elsewhere, it is not enough to prove that a lawyer was negligent. A plaintiff must also establish that he suffered damages proximately caused by the lawyer's negligence. *Lamb v. Barbour*, 188 N.J.Super. 6, 455 A.2d 1122 (A.D.1982); *Lieberman v. Employers Ins. of Wausau*, 171 N.J.Super. 39, 407 A.2d 1256 (1979), *aff'd* 84 N.J. 325, 419 A.2d 417 (1980); *Cotton v. Travaline*, 179 N.J.Super. 362, 432 A.2d 122 (1981); *Snyder v. Baumecker*, 708 F.Supp. 1451 (D.N.J. 1989). Even if a lawyer's malpractice is obvious, a client may not prevail in a suit against the lawyer where the underlying claim is meritless and no damages were caused by the lawyer's negligence. *Vort v. Hollander*, 257 N.J.Super. 56, 607 A.2d 1339 (A.D.1992).

If Majek was actually liable to Alcman for the full amount of the $7 million judgment, as Alcman has previously avowed, then Majek has no legal malpractice claim because it suffered no damages. Alcman would therefore have to argue before this Court that Majek's liability arose because of Bullock's negligence, while having previously sworn before the Pennsylvania court that Majek's liability arose solely, and rightfully, from Majek's failure to fulfill its contractual obligations towards Alcman.

In *Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313 (Tex.App.Ct.1994), the court forbade a similar assignment as a "transparent device to replace a judgment-proof, uninsured defendant with a solvent defendant." *Id.* at 317. In decrying the "demeaning reversal of roles" such assignments would create, the Court argued that,

> The two litigants would have to take positions diametrically opposed to their positions during the underlying litigation because the legal malpractice case requires a "suit within a suit".... For the law to countenance this abrupt and shameless shift of positions would give prominence (and substance) to the image that lawyers will take any position, depending upon where the money lies, and that litigation is a mere game and not a search for truth. It is one thing for lawyers in our adversary system to represent clients with whom they personally disagree; it is something quite different for lawyers (and clients) to switch positions concerning the same incident simply because an assignment and the law of proximate cause have given them a financial interest in switching.

*Id.* at 318 (internal citations omitted). We agree with this reasoning.

We therefore hold that the doctrine of judicial estoppel bars Alcman from arguing that its $7 million default judgment is the product of Bullock's malpractice, where Alcman argued in a previous forum that the judgment was entirely the product of Majek's contractual liability. Because Alcman is barred by its previous affidavit from arguing that any portion of its $7 million default judgment is attributable to Bullock's negligence, it cannot show that Majek suffered any damage, which is a necessary component of a legal malpractice claim. This alone is enough to warrant dismissal with prejudice.

B. *Assignment of a Claim for Attorney Malpractice Under New Jersey Law*

■ Courts in different jurisdictions have disagreed as to whether or not claims for legal malpractice are assignable. Under the common law, generally speaking, contracts claims were assignable, but torts claims were not. Courts which have forbidden assignment of legal malpractice claims have reasoned that such claims should not be assignable because of the close personal relationship between attorney and client and have likened the claims to torts involving personal injury. Courts which have upheld assignment have argued that legal malpractice claims are based on contract. *See* 40 A.L.R. 4th 684.

■ Neither the New Jersey courts nor the legislature has decided the matter explicitly. The only New Jersey statute

dealing with assignability is N.J.S.A. 2A:25–1, which provides in relevant part:

All contracts for sale and conveyance of real estate, all judgments and decrees recovered in any of the courts of this state or of the United States or in any of the courts of any other state of the United States and all choses in action arising on contract shall be assignable, and the assignee may sue thereon in his own name.

It is clear, however, that in New Jersey claims arising out of tort are not assignable prior to judgment. *United States Casualty Co. v. Hyrne,* 117 N.J.L. 547, 189 A. 645 (1937); *East Orange Lumber Co. v. Feiganspan,* 120 N.J.L. 410, 199 A. 778 (1938). Although plaintiff asserts that judgment has already been entered in this matter, judgment has been entered only against Majek, not against Bullock.

█ It is equally clear in New Jersey that legal malpractice actions are grounded in tort. *Circle Chevrolet Co. v. GH & C,* 274 N.J.Super. 405, 413, 644 A.2d 626 (App.Div. 1994), aff'd 142 N.J. 280, 662 A.2d 509 (1995) ("[p]rofessional malpractice actions are grounded in the tort of negligence"); *Grunwald v. Bronkesh,* 131 N.J. 483, 492, 621 A.2d 459 (1993) ("[a] legal malpractice action derives from the tort of negligence."). Plaintiff's argument that a legal malpractice action also sounds in contract has some foundation in other jurisdictions and in legal theory, but it has no foundation in the law of New Jersey.

A simple syllogism thus dictates the conclusion that New Jersey prohibits the assignment of claims for legal malpractice: a tort claim is not assignable; legal malpractice is a tort claim; therefore, a legal malpractice claim is not assignable.

In addition, we believe that New Jersey courts, if faced with this issue directly, would prohibit the assignment of claims for legal malpractice under any circumstances for compelling reasons of public policy. A party should not be permitted to transmute a claim against a penniless adversary into a claim against the adversary's wealthier lawyer based on the lawyer's supposed negligence towards the adversary. A legal malpractice action is not a commodity to be sold to a bidder who has never even had a relationship with the lawyer. The decision to bring a legal malpractice action "is one peculiarly vested in the client." *Chaffee v. Smith,* 98 Nev. 222, 645 P.2d 966 (1982). There is, in addition, a high risk that the plaintiff and defendant in the underlying litigation will collude to the detriment of the defendant's lawyer. *See e.g., Coffey v. Jefferson County Board of Education,* 756 S.W.2d 155 (Ky. App.Ct.1988); *Wagener v. McDonald,* 509 N.W.2d 188 (Minn.App.1993). Permitting this sort of alchemy would lead to baseless and excessive legal malpractice claims and would undermine the personal confidence that must exist between lawyers and clients. *See, e.g., Goodley v. Wank & Wank, Inc.,* 62 Cal.App.3d 389, 133 Cal.Rptr. 83 (1976).

The Supreme Court of Indiana, in finding such assignments to be invalid, expressed the risks of an agreement between former adversaries succinctly:

If assignments were permitted, we suspect that they would become an important bargaining chip in the negotiation of settlements—particularly for clients without a deep pocket. An adversary might well make a favorable settlement offer to a judgment-proof or financially strapped client in exchange for the assignment of that client's right to bring a malpractice claim against his attorney. Lawyers involved in such negotiations would quickly realize that the interests of their clients were incompatible with their own self-interest. The court in Washington has suggested that attorneys representing such clients would be bound by loyalty to sacrifice their own hides (and the deep pockets of their malpractice insurance carriers) in order to secure a favorable settlement for their client.

*Picadilly, Inc. v. Raikos,* 582 N.E.2d 338, 343 (Ind.1991). The Indiana Court held that such assignments threatened the attorney's duty to act loyally by creating conflicts of interest. In defending such suits, lawyers would be compelled to divulge confidential details of their relationship with clients, which would harm the attorney-client relationship. Finally, such suits would make insolvent, under-insured, judgment-proof de-

fendants extremely unattractive clients, thereby making it harder for them to obtain legal representation.

### C. Choice of Law

The Agreement states expressly that "[t]he Assignment of the subject legal malpractice cause of action including all agreements contained therein, is entered into in the State of New Jersey and shall be construed and interpreted in accordance with the Laws of the State of New Jersey." Def. Ex. D, ¶ 8. Despite having agreed to this clause, plaintiff now asserts that the law of Pennsylvania, which permits the assignment of at least some legal malpractice claims, should apply.

New Jersey choice of law rules generally permit the parties to a contract to choose which state's law will govern issues arising out of that contract. "Ordinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey will uphold the contractual choice if it does not violate New Jersey's public policy." *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 341, 614 A.2d 124 (1992). In this regard, New Jersey follows the Restatement (Second) of Conflict of Laws § 187, which provides that a contractual choice of law provision will be enforced as long as the forum bears a reasonable relationship to the parties of the transaction and the application of the law of the chosen state would not violate a fundamental policy of a state which has a materially greater interest than the chosen state and whose law would otherwise apply. *See Instructional Systems*, 130 N.J. at 342, 614 A.2d 124; *Kalman Floor Co. v. Jos. L. Muscarelle, Inc.*, 196 N.J.Super. 16, 21–22, 481 A.2d 553 (App.Div.1984); *Conopco Inc. v. McCreadie*, 826 F.Supp 855, 864 (D.N.J. 1993).

The parties chose New Jersey law. Majek and Bullock, the only two parties in-

volved in the underlying legal malpractice claim, are both located in New Jersey (although the assignee is a Pennsylvania corporation). The contract of Assignment was entered into in New Jersey. Def.Ex. D, ¶ 8. The factors that might otherwise suggest that Pennsylvania law should apply—that the Building and Alcman are located there—relate to the dispute between Majek and Alcman, not to the dispute between Majek and Bullock.

This case thus involves the assignment, in New Jersey, of a claim arising between two New Jersey parties whose dealings were entirely in New Jersey. This state has as well a significant interest in the relationship between its lawyers and their clients. Even in the absence of the choice of law provision, New Jersey law would most likely apply; certainly it should apply where, as here, the parties have expressly selected it. Pennsylvania clearly does not have, as the Restatement would require to overturn the choice of law provision, a "materially greater interest" in this matter than New Jersey. Indeed, the opposite is true. We therefore find that New Jersey law should apply and that, as discussed previously, the assignment is invalid.[4]

### D. Pennsylvania Law

Although we find that New Jersey law applies, we will nevertheless also explore the matter as if Pennsylvania law applied. Although both parties appear to believe that Pennsylvania law would permit the assignment of the present legal malpractice claim, we disagree.

The law in Pennsylvania permitting the assignment of a claim for legal malpractice is founded on two cases, *Hedlund Mfg. v. Weiser, Stapler & Spivak*, 517 Pa. 522, 539 A.2d 357 (1988), and *Ammon v. McCloskey*, 440 Pa.Super. 251, 655 A.2d 549 (1995). In *Hedlund*, a 4–2 opinion of the Pennsylvania Supreme Court, an inventor

---

4. The choice of New Jersey law does not appear to have been a mistake. New Jersey allows a six-year statute of limitations for legal malpractice. Pennsylvania allows only two years for most elements of a legal malpractice claim. Alcman argues that we should re-write the contract to apply Pennsylvania law because the parties could

not have intended to enter into an invalid contract. We see no basis for re-writing a contract term that is not only clear and unambiguous but was consciously selected by the parties to deal with a perceived problem with the statute of limitations.

employed a lawyer to patent his invention. The lawyer failed to file the patent application within one year of the date of first sale, as required by statute, and the inventor lost the patent. A year later, Hedlund Manufacturing Co. purchased the inventor's business, and the inventor assigned his legal malpractice claim against the patent attorney to Hedlund. The Court upheld this assignment, holding that "we will not allow the ... attorney-client relationship to be used as a shield by an attorney to protect him or her from the consequences of legal malpractice." *Id.*, 539 A.2d at 359. Thus, the court permitted the assignment of a legal malpractice claim to a party who, in buying the business, had stepped into the shoes of the original client and was, in addition, the only remaining party with any interest in pursuing the claim.[5]

In *Ammon,* a decision of the Pennsylvania Superior Court (an intermediate appellate court) a passenger sued the driver of the car which was involved in an accident. The driver's lawyer failed to raise a meritorious defense at trial, and a substantial judgment was entered against the driver. The driver fired his old lawyer and retained a new one. The new lawyer, in exchange for the passenger's promise not to execute the judgment against the driver, assigned to the passenger the driver's claim for legal malpractice against the driver's former lawyer. *Ammon* upheld this assignment, citing *Hedlund.*

We believe that the *Ammon* court read *Hedlund* too broadly. *Hedlund* split 4–2 over whether to permit assignment to a party who had purchased the original client's business, thereby stepping into his shoes. In *Ammon,* by contrast, the parties to the assignment contract were adversaries in the underlying litigation. As we explained in Parts III A. & B., *supra,* permitting assignments of legal malpractice claims where the parties to the assignment were adversaries in the underlying litigation implicates different public policy considerations which militate strongly against permitting assignment.

■ We therefore believe that the Pennsylvania Supreme Court would hold that *Hedlund* should be limited to its facts and that *Ammon*'s reliance on this decision was unjustified.[6] We would therefore hold, assuming that we need address the issue at all, that the assignment of Majek's claim against Bullock to Alcman would be invalid even under Pennsylvania law.

## IV. CONCLUSION

We hold that Alcman is judicially estopped from arguing before this Court that Bullock's negligence proximately caused all or any part of the $7 million default judgment against Majek, since Alcman has previously represented to another court, under oath, that this sum represents a genuine debt owing to it. We also find that (1) New Jersey law does not permit the assignment of legal malpractice claims; (2) New Jersey and not Pennsylvania law applies; and (3) even under Pennsylvania law the present assignment would be invalid. Defendants' motion to dismiss will therefore be granted, and an appropriate order will enter.

---

5. Those courts which have directly addressed the reasoning of the *Hedlund* majority have generally found it to be unpersuasive. *See e.g., Wagener,* 509 N.W.2d at 188; *Continental Cas. Co. v. Pullman, Comley, Bradley and Reeves,* 709 F.Supp. 44 (D.Conn.1989); *Scarlett v. Barnes,* 121 B.R. 578 (W.D.Mo.1990); *Roberts v. Holland & Hart,* 857 P.2d 492 (Colo.App.1993); *Zuniga,* 878 S.W.2d at 313.

6. We recognize that, in predicting the law of a particular state, we must give serious consider-

ation to the decisions of intermediate appellate courts in ascertaining and applying state law. *Robinson v. Jiffy Executive Limousine Co.,* 4 F.3d 237 (3d Cir.1993). However, we are not bound to follow a lower state court where we believe, as we do here, that the lower court has misunderstood and misapplied the holding of the state Supreme Court. *Hamme v. Dreis & Krump Mfg. Co.,* 716 F.2d 152, 155 (1982) (and cases cited therein).